JOHN B. HUBBARD v. SUSAN A. BUGBEE.

*Promissory Note of Married Woman Void. Promise by Her to Pay it After Death of Husband. No Consideration. New Promise. R. L. s. 2322.*

1. While the defendant was a married woman, her mother gave her by will a farm and personal property thereon, mainly live stock, which came into the possession of the defendant and her husband. The will was in general terms, with no words limiting the gift to " her sole and separate use," or excluding the marital rights of her husband. The personalty being attached on the husband's debts contracted by him for carrying on the farm and supporting the family, she borrowed money to discharge the attachments, and gave her note therefor. Subsequently she renewed the note, and, after the decease of her husband, she being sole, promised in-writing to pay it; *Held*, that the defendant had no separate estate in either the real or personal property; that the husband's rights were not affected by the statute, R. L. s. 2322, as it was passed after the personalty vested in him; that the note was void; and that there was not a sufficient consideration for the new promise. (*Hubbard v. Bugbee*, 55 Vt. 506, distinguished.)

2. A letter written by defendant offering to renew the note, etc., is held to amount to a new promise, sufficient, if for a legal consideration, to remove the bar of the statute.

ASSUMPSIT, general and special. Heard on the report of a referee, December Term, 1883, Caledonia County, Ross, J., presiding. Judgment for the defendant.

The special.count set up the material facts, averred that the defendant had a separate estate, created the debt on its faith and credit, and when discovert promised to pay it. Pleas, general issue, Statute of Limitations and coverture at the time of making the alleged promises. The referee found, that the defendant was the daughter of John Bowen

and Hannah B. Bowen, who lived on a farm in Concord, owned by Hannah B., who deceased sometime before November, 1885; that the will of said Hannah B. was duly probated in said November, and Joel Fletcher was appointed executor; that the defendant was married in 1853 to Edwin Bugbee, and lived with him as his wife until his death in 1881; that at the time of the death of the defendant's mother, the defendant and her husband were living on said farm, and continued to live there and carry it on until the death of said Edwin, except that he was away some two years, and that the defendant still lives on the farm and owns it under the will.

The referee also reported, that at the time of the death of the defendant's mother there was on the farm, belonging to her, certain personal property, mainly live stock, which "came into the possession of the defendant and her said husband upon the mother's death, the father living with them, not they with him, they carrying on the place, not he"; that, "the defendant's title to said live stock was such only as said will gave her"; that said husband "was not very thrifty and never had much property"; that "in the spring of 1858 said Edwin was owing several parties for goods and property bought by him before that time, for carrying on the farm, supporting the family, and his general expenses"; and during that spring those creditors brought suits against said Edwin to recover their said debts, and attached the live stock aforesaid; that said Fletcher advised that money should be hired to pay off those debts; that Lucy M. Hubbard, defendant's sister, also advised it and offered to loan the money for that purpose; that it was finally decided to take the money and settle the suits, which was done; that the money was not delivered to defendant in person, but both she and said Lucy M. understood how the money was to be used; that the defendant alone gave her note for said money; that she signed without her husband because she was considered the responsible party; that is,

that she owned the property as a separate estate; that it "was expected by all parties interested that Edwin would go on and carry on the farm, and take care of the stock, and be able from his earnings, or from the produce of the farm" to pay the borrowed money. It was further reported, that the defendant renewed the note June 10, 1864, by giving a new one; that a payment of $30 was made August 1, 1864; that a second payment was made May 30, 1870; that May 16, 1876, the plaintiff, who became the lawful holder of the note, took a horse in part payment; that on April 14, 1882, the plaintiff wrote to the defendant urging payment; and on April 19 the defendant replied as follows, in part:

"Yours of the 14th came to hand last night * * * and in reply will say, I am willing to do all that I can. I thought when you was down that I should get something of Russell, and come up and make a payment; but he cannot let me have anything. If I can renew it, should like to; I do not know what else to do. * * * I could sell my farm and pay it. * * * I think it would be better if I can sell, and I could pay it. * * * Be sure and let me know what I can do."

The will was in part: "I give to my beloved husband, John Bowen, and my unmarried daughter, Amanda Bowen, jointly and for their use, the rents and profits of my estate, real and personal, during the life of my beloved husband, and so long to my daughter Amanda as she remains unmarried; meaning to devise to her a home and bequeath to her a living and support while she remains single. And if she should be married, it is my will that she be paid out of my personal estate the sum of $100. * * * It is my will also that my said daughter Amanda be paid the sum of $300 in annual payments of $25 each, the first payment to be made in one year from my decease, and so on $25 a year until the whole is paid; meaning also that after her marriage and departure from the homestead her rents and profits of the homestead shall cease, and on the payment of the above legacy all her claims shall cease. After the fulfillment of the above named devises and bequests to my beloved husband and daughter Amanda, I give to my

daughter, Susan Angeline Bugbee, the whole of my real and personal estate." The report only stated as to said Amanda: "The defendant's sister Amanda, named in said will, lived on the farm with the defendant until her marriage in December, 1860."

*Cahoon & Hoffman*, for the plaintiff.

The defendant's letter after the death of her husband constitutes a promise to pay the note. The defendant contends that this money did not go for the improvement of her separate estate. The farm and stock vested in her by will. In the forum of conscience they were her debts; and she so understood it. The reasoning of REDFIELD, J., in *Hubbard* v. *Bugbee*, 55 Vt. 506, between these parties, fully sustains us in claiming that the defendant is liable upon her promise. The attachments, if followed by judgment and sale, would have depleted the separate estate, and it is fair to presume that they would have been. *Rawlins* v. *Rounds*, 27 Vt. 17.

The money was loaned upon faith in her credit and estate.

*Harry Blodgett* and *M. Montgomery*, for the defendant.

The contract proven was not such a contract that it could have been enforced against the defendant or her separate estate in a court of equity, and, therefore, does not constitute a sufficient consideration to support a new promise. *Hayward* v. *Barker*, 52 Vt. 430; 1 Pars. Cont. 432; *Watkins* v. *Halstead*, 2 Sandf. 311; *Waters* v. *Bean*, 15 Ga. 358.

The money for which the original note was given went to pay the husband's debts. The defendant's separate estate in 1858 was worth nothing, charged as it was with the support of her father and maiden sister, etc.; so that the money was not loaned on the credit of that estate. *Dale* v. *Robinson*, 51 Vt. 20; *Yale* v. *Dedern*, 18 N. Y. 265; *Willard* v. *Eastham*, 15 Gray, 328; *Priest* v. *Cone*, 51 Vt. 495; *Brown* v. *Sumner*, 31 Vt. 671.

The opinion of the court was delivered by

POWERS, J.   It has been assumed in the argument of this case that the defendant took and held, under the will of her mother, a separate estate in the farm and live stock in question.

The referee in his report says that "The defendant took and had such an interest in said farm as is given by said will; and there was no evidence that she ever had any other interest or title therein"; and that "the defendant's title to said live stock was such only as said will gave her."

If, therefore, the defendant had a separate estate in the farm and live stock, it was created by the will of her mother.   The clause of the will giving her this property is as follows:   "After the fulfillment of the above named devises and bequests to my beloved husband and daughter Amanda, I give to my daughter Susan Angeline Bugbee the whole of my real and personal estate."   Then follows a provision making it obligatory upon the defendant and her husband to live upon said farm during the life-time of the testatrix and her husband, which condition was fully complied with.

The gift of the real and personal estate is in general terms, with no words limiting it to the separate use of the defendant.   Such a conveyance does not create a separate estate, in the sense in which the term is used in the books.

There are two kinds of separate estates which married women may hold.   One is the creation of courts of equity, the other is statutory.

An equitable separate estate can only exist, with the qualifications hereinafter noticed, when it is made such in the grant of the title by the use of unequivocal words showing an intent in the grantor to exclude the marital rights of the husband,—such as the words "to her sole and separate use," or other words of like import.   If such words are not used, the title will pass to the married woman; but the use will go to her husband, under the rules of the common law.

In other words, inasmuch as a grant in general terms to a wife, at common law conveyed to her the title, and her husband, *jure uxoris*, at once became seized of the use; in order to create an equitable separate estate in the wife, it must appear from the terms of the grant that the grantor intended that the wife should take both the title and use. The intent to exclude the marital rights of the husband must be clear and certain. 2 Perry Trusts. s. 647.

"Separate estate in a married woman involves, as the characterizing fact, that she holds it to her sole use, in exclusion of the marital rights of the husband." *Frary* v. *Booth*, 37 Vt. 78.

As there are no words in the will signifying an intent to exclude the husband's common law rights to this property, it is clear that the defendant had no separate estate under said will. Accordingly, when the will took effect, her husband, Edwin, became the absolute owner of the personal property in possession, and became entitled, during the life of his wife, to the rents, issues, and products of her real estate.

But in many cases where the conveyance has lacked qualifying words limiting the estate to the wife's separate use, the husband himself has given to it such effect. Thus, unless the rights of creditors are prejudiced, the husband may himself convey an estate to his wife to be held to her separate use; or, by an ante-nuptial or post-nuptial agreement, contract that his wife shall hold her property in exclusion of his right; or may allow her, without previous agreement, to manage and control it, holding herself out to the world as its sole owner, dealing and contracting on its faith and credit as owner; or he may renounce his marital right, abandon the possession to her, and thus compel her to use it in procuring her support. Other analogous instances might be cited. In all such cases equity has treated the wife's interest as an equitable separate estate, on the ground that, although the grant of the title to the wife did

not vest the sole use of the estate in her, nevertheless, as the husband was alone interested adversely to such separate use in the wife, he might supplement the grant of the title, by relinquishing his marital right, thus giving the wife the exclusive use. His act, under such circumstances, may be properly regarded in substance as a grant by him of the use to the wife. Illustrations of this doctrine are found in *Richardson* v. *Merrill,* 32 Vt. 27; *Frary* v. *Booth,* 37 Vt. 78; *Dale* v. *Robinson,* 51 Vt. 20; *Priest* v. *Cone,* 51 Vt. 495, and many other cases in this and other states.

But the case at bar cannot be brought within the range of these cases. There is nothing to show that the husband was excluded from his marital rights, in the administration of the property; and the referee says the wife's title was such only as she took under the will.

Nor is there in the case a statutory separate estate in the defendant. We have no statute providing that married women shall hold land, conveyed to them during coverture, to their separate use; but s. 2322 R. L. provides that " Personal property and rights of personal action acquired by a married woman during coverture, by inheritance or distribution, shall be held by her to her sole and separate use."

This statute was passed in 1867. The personal property conveyed by this will came to the defendant's husband before that time. The property being vested in him prior to the passage of the act, his title was not and could not be devested by it.

As the defendant had no separate estate in either the real or personal property in question, she had no capacity, legal or equitable, to make contracts chargeable upon it.

If, as the plaintiff assumes, the defendant had had a separate estate in the property, her note, given for money to release her property from the clutches of the law, would be founded on good consideration and enforceable, during coverture, against such estate. It is universally held that as to those engagements which are enforceable against

separate estates of married women, they contract as fully and freely as if *sole*. In other words, the disability of coverture as to such contracts is suspended or inoperative. The separate estate cannot be charged unless the *feme* has made a contract effectual to charge it. Such contract, therefore, is an essential factor in the creditor's right to enforce his debt. Such contracts then are valid. They are enforceable obligations to all intents, like contracts made by persons *sui juris*, except a resort must be had to a different forum for their enforcement, and no personal judgment can be rendered thereon. But these matters touch the remedy only and do not prove any inherent vice in the obligation itself.

Being thus obligatory, a moral obligation arises thereon sufficient in law, as a consideration, to uphold a new promise made when the woman is discovert to perform them. *Lee* v. *Muggeridge*, 5 Taunt. 36; *Flight* v. *Reed*, 1 H. & C. 702 ; *LaTouche* v. *LaTouche*, 3 H. & C. 575 ; *Goulding* v. *Davidson*, 26 N. Y. 604; *Vance* v. *Wells*, 8 Ala. 399; *Hubbard* v. *Bugbee*, 55 Vt. 506.

*Lee* v. *Muggeridge, supra*, though said not to be law, 1 Pars. Cont. 435, can be upheld on its facts. The wife in that case had a separate estate. In England her general engagements are binding upon it; and by giving her bond, it is there presumed that she intended to bind it. Hence, her contract was not void, and the case is like *Hubbard* v. *Bugbee, supra*.

It follows logically that her distinct, unqualified, written acknowledgment of a subsisting indebtedness upon such contracts, with an apparent willingness to remain liable therefor, made when she becomes discovert, is enough to raise an implied promise to pay, and thus remove the bar of the Statute of Limitations. And as by the great weight of authority, such new promise is a new cause of action based upon the original consideration,—Ang. Lim. 245; *Bell* v. *Morrison*, 1 Pet. 351 [28 U. S. bk. 7,175]; notes to *Whitcomb* v. *Whiting*, 1 Smith Lead. Cas. 858,—there is no difficulty in

maintaining the action of *assumpsit* upon a promise thus made, when the *feme* is discovert and capable of binding herself at law. The letter of April 19, written by the defendant fully warrants the implication of a new promise.

But in this case the defendant had no separate estate. Her note, therefore, was void. From her void contracts, no moral obligation arises, which can be a sufficient consideration for a new promise, express or implied, to perform them. *Hayward* v. *Barker*, 52 Vt. 429.

In this connection it is proper to say that this case was once before this court, on demurrer to the declaration, and is reported, 55 Vt. 506. The declaration set forth that the defendant had a separate estate in the property in question and executed the note in question upon its faith and credit, and after the death of her husband promised to pay it. The demurrer admitted these facts; and the decision was expressly grounded upon these facts.

It was not intended in that case to question the doctrine advanced in *Hayward* v. *Barker*, 52 Vt. 429. In *Hayward* v. *Barker*, no binding obligation rested upon the wife during coverture, hence there was no moral obligation to support the subsequent promise made after coverture. In the case at bar, as it stood when formerly before us, the obligation was binding during coverture, and thus furnished a sufficient moral, if not valuable, consideration for the subsequent new promise made after the coverture ended. Both cases, therefore, are sound in principle and rest upon abundant authority.

The judgment for the defendant is affirmed.